UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JUSTIN BONNER,<br>    Plaintiff,<br><br>    v.<br><br>BARONE, et al.,<br>    Defendants. | No. 3:21-cv-811 (SRU) |

**INITIAL REVIEW ORDER**

Justin Bonner ("Bonner"), proceeding *pro se*, filed this complaint under 42 U.S.C. § 1983 against six defendants: Warden Barone, Captain Flemmings, Counselor Jahic, Lieutenant Dwane Harmon, Correctional Officer Bauza, and Correctional Officer Jane Doe. Compl., Doc. No. 1. Currently confined at Garner Correctional Institution, Bonner generally alleges that the defendants failed to protect him from assault by other inmates in violation of the Eighth Amendment when he was previously incarcerated at MacDougall-Walker Correctional Institution ("MacDougall"). *Id.* Bonner seeks damages as well as declaratory and injunctive relief from the defendants in their individual capacities. *Id.* Bonner's complaint was received on June 15, 2021, and his motion to proceed *in forma pauperis* was granted on July 1, 2021.

Under section 1915A of Title 28 of the United States Code, I must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A. This requirement applies both when the plaintiff pays the filing fee and when he proceeds *in forma pauperis*. *See Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam).

Although detailed allegations are not required to survive initial review, a complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a plausible right to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Nevertheless, it is well-established that "[p]ro se complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

I.     **Allegations**

The incidents underlying the complaint occurred while Bonner was incarcerated at MacDougall-Walker Correctional Institution. Prior to his transfer to MacDougall, Bonner renounced membership in a white supremacist group; nevertheless, Bonner still has several white supremacist tattoos. Doc. No. 1 ¶ 11.

Because of his background, members of the FBI asked Bonner to transfer to MacDougall and obtain information about white supremacist groups there. *Id.* ¶¶ 12-13. Bonner agreed. *Id.* ¶ 13. The FBI arranged for Bonner to be transferred to MacDougall and asked that he not be housed with Black or Latino inmates. *Id.* ¶ 14. Warden Barone was aware that the FBI had arranged the transfer and knew of the housing request. *Id.* ¶¶ 15-16.

In February 2020, Bonner was housed in O-pod with a Black cellmate. *Id.* ¶ 17. The cellmate threw boiling water on Bonner to burn away Bonner's white supremacist tattoos. *Id.* Bonner received burns on his body. *Id.* Warden Barone was informed of this incident. *Id.* ¶ 18.

In January 2021, Bonner was housed in M-pod. *Id.* ¶ 19. During the week of January 3, 2021, Bonner told Captain Flemmings and Counselor Jahic that he was being threatened by several Black inmates because of the tattoos. *Id.* Jahic told Bonner that he would speak with Flemmings about a transfer, but Jahic warned that such a move might be difficult because it was known that Bonner was a white supremacist. *Id.* ¶ 20. Bonner also spoke to Flemmings about the threats, who told Bonner that his tattoos did not help him and that that everyone knew he was a white supremacist. *Id.* ¶¶ 21-22. Flemmings also said that he was not concerned about the threats because such threats were not often carried out. *Id.* ¶ 23.

On January 10, 2021, Officer Doe witnessed a Black inmate arguing with Bonner and two other Black inmates threatening him. *Id.* ¶ 24. Bonner asked her to call the lieutenant and have him moved because he feared for his safety. *Id.* ¶ 25. Officer Doe refused, stating that it was 2:30 p.m., her shift ended in thirty minutes, and she did not want to do the paperwork. *Id.* ¶ 26. She told Bonner to address his concerns with the second shift officers. *Id.*

Between 3:15 p.m. and 4:00 p.m., Bonner stopped Officer Bauza as he was touring the unit to relay safety concerns regarding the threats, and Bonner asked Bauza to call a supervisor. *Id.* ¶ 27. Bauza called Lieutenant Harmon, returned to Bonner's cell, and informed him that Harmon was unwilling to move "that racist cracker." *Id.* ¶ 28.

At 4:30 p.m., cell doors opened for the evening meal. *Id.* ¶ 29. Three Black inmates entered Bonner's cell and assaulted him, causing serious injuries. *Id.* Bauza called a code. *Id.* ¶ 30. During the time it took for staff to respond, the inmates continued to assault Bonner. *Id.* After a delay, Lieutenant Harmon responded to the code. *Id.* ¶ 31. Harmon told Bonner that he took his time arriving upon hearing the code was at Bonner's cell because Bonner was a racist and deserved the beating. *Id.* While escorting Bonner out of the unit, Harmon announced to

Bonner's fellow inmates that Bonner was "a racist rat for the feds" and that he had been placed at MacDougall to inform on white supremacists. *Id.* ¶ 32.

Bonner was assessed with facial trauma and head injuries in the medical unit. *Id.* ¶ 34. He was taken to an outside hospital where he was diagnosed with a closed fracture of the nasal bone and treated for lacerations to his forehead and upper lip and abrasions to his face and torso. *Id.* ¶ 35. Bonner was discharged from the hospital and referred to an ENT specialist. *Id.* ¶ 36. On January 12, 2021, Bonner was seen by an ENT at UConn who recommended a further visit to consider surgery to repair the fracture. *Id.* ¶ 36.

On January 25, 2021, Bonner was transferred to Garner. *Id.* ¶ 37.

**II.      Analysis**

Bonner asserts an Eighth Amendment claim for failure to protect him from harm and a supplemental state law claim for negligent failure to protect. His claims are based on the lack of precautions by Warden Barone and Captain Flemmings even though they knew of the prior assault in O-pod, Lieutenant Harmon's delay in responding to the code, and the lack of action by Officers Bauza and Doe and Counselor Jahic after Bonner communicated his fear of assault.

  A.  Exhaustion

The Prison Litigation Reform Act of 1995 ("PLRA") requires that a plaintiff must "exhaust such administrative remedies as are available" prior to bringing a civil suit challenging prison conditions. *Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016) (quoting 42 U.S.C. § 1997e(a)). Because Bonner is incarcerated in a Connecticut correctional facility, the administrative remedies available to him for resolving administrative issues are provided by the Connecticut Administrative Directives, written guidelines that establish "the parameters of

operation for Connecticut correctional facilities." *Nicholson v. Murphy*, No. 02-CV-1815 (MRK), 2003 WL 22909876, at *18 n.2 (D. Conn. Sept. 19, 2003).

Bonner merely alleges that he has exhausted his administrative remedies with respect to all defendants but attaches no grievance forms demonstrating that he has done so. Compl., Doc. 1, at 11. Because it is not clear whether Bonner was able to timely file his original grievance, whether he exhausted administrative remedies with respect to his other claims, or whether an exception to the exhaustion requirement applies, dismissal for failure to exhaust administrative remedies would be premature at this stage of the proceedings. *See, e.g., Ross*, 136 S. Ct. at 1859 (discussing various exceptions to the exhaustion requirement).

B. Eighth Amendment

The Eighth Amendment's ban on cruel and unusual punishment has been interpreted to impose a duty on prison officials to make reasonable efforts to ensure inmate safety, including protecting inmates from harm at the hands of other inmates. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997). But not every injury suffered by one prisoner at the hands of others establishes constitutional liability on the part of the prison official. *Anderson v. Quiros*, No. 3:18-CV-1107 (MPS), 2018 WL 3677901, at *3 (D. Conn. Aug. 2, 2018) (citing *Farmer,* 511 U.S. at 834). To state an Eighth Amendment claim premised on failure to protect, Bonner must allege (1) that the conditions of his incarceration posed a substantial risk of serious harm and (2) that prison officials were deliberately indifferent to his safety. *See Farmer*, 511 U.S. at 834; *Conquistador v. Adamaitis*, No. 3:19-cv-430 (KAD), 2019 WL 1573710, at *2 (D. Conn. Apr. 11, 2019).

Deliberate indifference exists where prison officials know of and disregard an excessive risk to inmate safety. *See Farmer*, 511 U.S. at 836-37; *Bridgewater v. Taylor*, 698 F. Supp. 2d

351, 358 (S.D.N.Y. 2010).  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  Nevertheless, knowledge of the risk of harm "may be proven 'from the very fact that the risk was obvious.'"  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Farmer*, 511 U.S. at 842).  The court makes this determination, not in hindsight, but considering the "facts and circumstances of which the official was aware at the time he acted or failed to act."  *Hartry*, 755 F. Supp. 2d at 436 (cleaned up).

Under the liberal construction required as this stage, Bonner states a plausible claim for excessive risk. I infer that an excessive risk to Bonner's safety existed from the facts that Bonner was assaulted by three inmates and suffered injuries.

Next, I consider whether the defendants were aware of and disregarded that risk.  I address each defendant in turn.

First, I address Captain Flemmings.  In *Conquistador*, the plaintiff alleged that he told the lieutenant about a threat to attack him but the lieutenant refused to move him and did nothing to ensure his safety. 2019 WL 1573710, at *2.  There, the plaintiff "sufficiently alleged that [the lieutenant] was aware that other inmates posed a serious risk of harm" and "recklessly failed to act with reasonable care to mitigate the risk of harm."  *Id.*

Here, during the week prior to the assault, Bonner told Flemmings and Jahic that he was being threatened by several Black inmates because of his tattoos.  Although Bonner requested a transfer, both told him that a move would be difficult because of his reputation as a white supremacist.  Flemmings, specifically, discounted the threats and took no action.  It is not clear whether Flemmings' statement that threats are often not carried out shows that he did not

appreciate the threat to Bonner's safety or is evidence that he understood but disregarded the risk. But I must consider the facts in the light most favorable to Bonner. Accordingly, the failure to protect claim against Flemmings survives and proceeds for further development of the record.

Second, on the other hand, there is insufficient evidence that Counselor Jahic deliberately disregarded Bonner's safety. Jahic told Bonner that he would speak with Flemmings about a transfer, and Bonner does not allege Jahic failed to do so nor that Jahic had any ability to effectuate the transfer in the face of Flemmings' refusal. Because Jahic took action in response to the threats, he did not disregard the risk to Bonner's safety. As Bonner alleges no other actions Jahic could have taken, Bonner fails to state a plausible failure to protect claim against Jahic. The claim against Jahic is dismissed.

Third, I address Lieutenant Harmon. Bonner alleges that Harmon told him that he delayed responding to the code when he knew Bonner was being assaulted and that Harmon told the inmates in the housing unit that Bonner was an FBI informant. Inmates cooperating with the government are subject to heightened risks, and "proof of awareness of a substantial risk of the harm suffices" to illustrate deliberate indifference. *Hartry v. Cty. of Suffolk,* 755 F. Supp. 2d 422, 438 (E.D.N.Y. 2010).

Here, Harmon's delay caused Bonner to suffer more injuries and exposing him as a cooperator subjected Bonner to additional harm. Those actions show a conscious— even reckless— disregard for Bonner's safety. Accordingly, the claim against Harmon will proceed.

Fourth, Officer Doe witnessed the threats but did nothing about them. Doe did not fail to understand the threat. Rather, she chose to pass the responsibility to the officers on the next shift

because it was near the end of her shift. Her understanding of the threat and failure to act is sufficient to state a plausible failure to protect claim. The claim against Doe proceeds.

Fifth, Officer Bauza spoke to Lieutenant Harmon after Bonner communicated his fear of his safety. When the assault occurred, Bauza called a code. It is not clear whether Bauza attempted to stop the assault or merely waited for officers to respond to the code. "Inaction by a corrections officer to intercede and halt an attack by a fellow prisoner is sufficient basis for deliberate indifference." *Williams v. Connell*, 2018 WL 3468213, at *4 (N.D.N.Y. July 18, 2018) (cleaned up). But where the assault is an isolated incident, as here, the plaintiff must allege an evil intent, recklessness or at least deliberate indifference to the consequences of the officer's conduct. *Desulma v. City of New York*, 2001 WL 798002, at *7 (S.D.N.Y. July 6, 2001) (citing *Bass v. Jackson*, 790 F.2d 260, 262-63 (2d Cir. 1986)). Bonner's allegations against Bauza do not rise to this level. Thus, Bonner fails to state a plausible failure to protect claim against Bauza. The claim against Bauza is dismissed.

Sixth, I consider Warden Barone, a supervisory official. The Second Circuit has recently clarified the standard to be applied to a claim of supervisory liability. *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020). Prior to the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit had identified five categories of conduct that would establish liability of supervisors for the conduct of a subordinate in a section 1983 action, two of which were creation of a policy under which unconstitutional acts occurred and failure to act on information that unconstitutional acts were occurring. *Tangretti*, 983 F.3d at 616. In *Iqbal*, the Supreme Court rejected a theory of supervisory liability that permitted a supervisor to be "held liable based on a lesser showing of culpability than the constitutional violation requires." *Iqbal*, 556 U.S. at 677 (internal quotation marks omitted). In *Tangreti*, the Second Circuit adopted that

view and held that, "after *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676). Thus, Bonner must plead that Barone was personally aware of and disregarded the alleged constitutional violations.

Here, Bonner alleges Warden Barone was aware that the FBI had arranged his transfer to MacDougall and knew of the housing request. He also alleges that the warden was informed of the February 2020 incident in O-pod after it occurred. But the incident giving rise to this action occurred nearly a year later, and Bonner alleges no facts showing that he informed Barone that he feared for his safety in M-pod. Accordingly, absent allegations that Barone was personally aware of his issues and disregarded the possibility of harm, Bonner fails to state a plausible claim against Barone. The claim against Barone is dismissed.

C. <u>Negligent Failure to Protect</u>

In addition to his Eighth Amendment claim, Bonner contends that defendants' failure to protect him constituted negligence as defined by Connecticut common law.

Under Connecticut law, claims seeking damages against state employees in their individual capacities are barred by Conn. Gen. Stat. § 4-165(a), which provides: "[n]o state officer or employee shall be personally liable for damages or injury, not wanton or reckless or malicious, caused in the discharge of his duties or within the scope of his employment." State employees therefore cannot be held personally liable for negligent actions performed within the scope of employment. *Miller v. Egan*, 265 Conn. 301, 319 (2003). In order to overcome that statutory immunity, a plaintiff must adequately allege that the official's conduct was "wanton,

reckless or malicious," a standard defined by Connecticut courts as "more than negligence, more than gross negligence." *Martin v. Brady*, 261 Conn. 372, 379 (2002).

Here, all the defendants are state employees who are protected from suits for negligence. Bonner's allegations relate to actions taken with the scope of their employment. Therefore, they are statutorily immune from suit for damages unless Bonner alleges facts indicating "wanton, reckless or malicious" conduct. He does not, with one exception: Lieutenant Harmon acted recklessly by informing the other inmates that Bonner was cooperating with the government. Accordingly, the state law negligence claim asserted against defendants in their individual capacities is dismissed as barred by statutory immunity under Conn. Gen. Stat. § 4-165, except as against Harmon. *See* 28 U.S.C. § 1915A(b)(2). The negligence claim against Harmon may proceed.

D. Declaratory and Injunctive Relief

Bonner seeks declaratory relief in the form of a statement that the defendants violated his Eighth Amendment rights and an injunction that he be placed in a single cell in each correctional facility in which he may be housed.

Declaratory relief serves to "settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationship." *Colabella v. American Inst. of Certified Pub. Accountants*, 2011 WL 4532132, at *22 (E.D.N.Y. Sept. 28, 2011) (quoting *Beacon Const. Co., Inc. v. Matco Elec. Co., Inc.*, 521 F.2d 392, 397 (2d Cir. 1975)). Therefore, "[d]eclaratory relief operates prospectively to enable parties to adjudicate claims before either side suffers great damages." *Orr v. Waterbury Police Dep't*, 2018 WL 780218, at *7 (D. Conn. Feb. 8, 2018). In *Orr*, the court dismissed the request for declaratory judgment that the defendants had violated the plaintiff's Fourth Amendment

rights during his arrest because the request "concern[ed] past actions." *Id.* Accordingly, the plaintiff had "not identified any legal relationships or issues that require[d] resolution by declaratory relief." *Id.*

Here, Bonner similarly seeks declaratory relief based on past actions. He asks me to declare that the defendants' past actions allegedly violated his constitutional rights. As a matter of law, I cannot. Accordingly, the request for declaratory relief is dismissed.

Bonner also seeks an injunction, a form of prospective relief. Claims for prospective relief against a state official, however, may only be asserted against an official in his official capacity. *See Patterson v. Lichtenstein*, 2020 WL 837359, at *2 (D. Conn. Feb. 20, 2020) (injunctive relief is not available from the defendants in their individual capacities) (citing *Arzuaga v. Quiros*, 2015 WL 13021466, at *1 (D. Conn. Nov. 9, 2015)); *Kuck v. Danaher*, 822 F. Supp. 2d 109, 143 (D. Conn. 2011) (defendants lack authority to provide injunctive relief in their individual capacities). This is because, as individuals, the defendants are not authorized to take actions on behalf of the state.

Here, Bonner named the defendants only in their individual capacities. Accordingly, Bonner's request for injunctive relief is dismissed.

### III.    Conclusion

The claims against Warden Barone, Counselor Jahic, and Officer Bauza, all requests for declaratory and injunctive relief, and the supplemental state law claim are **DISMISSED** under 28 U.S.C. § 1915A(b). The claim of Eighth Amendment failure to protect will proceed against defendants Flemmings, Harmon, and Doe in their individual capacities. The state law negligence claim will proceed against Harmon in his individual capacity.

The court enters the following additional orders.

(1) **The Clerk shall** verify the current work address for defendants Flemmings and Harmon with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet containing the Complaint and this Order to each defendant at the address provided within **twenty-one (21) days** of this Order, and report to the court on the status of the waiver request on the thirty-fifth day after mailing.  If any defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on the defendant in his individual capacity and the defendant shall be required to pay the cost of such service.

(2) **The Clerk shall** send the plaintiff a copy of this Order.

(3) **The Clerk shall** send a courtesy copy of the Complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(4) The defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent.  If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claim recited above.  They also may include all additional defenses permitted by the Federal Rules.

(5) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this order.  Discovery requests need not be filed with the court.

(6) All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this order.

(7) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed.  If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(8) If the plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court. Failure to do so can result in the dismissal of the case. The plaintiff must give notice of a new address even if he is incarcerated. The plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If the plaintiff has more than one pending case, he should indicate all the case numbers in the notification of change of address. The plaintiff should also notify the defendants or the attorney for the defendants of his new address.

(9) The plaintiff shall utilize the Prisoner E-filing Program when filing documents with the court. The plaintiff is advised that the Program may be used only to file documents with the court. As local court rules provide that discovery requests are not filed with the court, discovery requests must be served on defendants' counsel by regular mail.

(10) The Clerk shall immediately enter the District of Connecticut Standing Order Re: Initial Discovery Disclosures concerning cases initiated by self-represented inmates and shall send a copy to the plaintiff.

(11) The Clerk cannot effect service on Officer Doe without her name and current work address. Bonner is directed to obtain this information through discovery and file a notice containing the information. Once Bonner has identified Officer Doe, the Court will order service.

So ordered.

Dated at Bridgeport, Connecticut, this 20th day of October 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge